EDWARD L. SEIDENFELD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Seidenfeld v. Commissioner
Docket No. 19433-92
United States Tax Court
T.C. Memo 1995-62; 1995 Tax Ct. Memo LEXIS 63; 69 T.C.M. (CCH) 1858; February 6, 1995, Filed *63 Decision will be entered under Rule 155. Edward L. Seidenfeld, pro se. For respondent: Thomas S. DiLeonardo. JACOBS
JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined the following deficiencies in, and additions to, petitioner's Federal income taxes: Additions to Tax Year
Deficiency
Sec. 6653(b)(1)
Sec. 6653(b)(2)
Sec. 6661
1983
$ 36,123
$ 18,062
[1]
$ 9,031
1984
23,932
11,966
[1]
5,983
1985
21,955
10,978
[1]
5,489
Following trial, respondent was permitted to amend her answer to conform to the evidence pursuant to Rule 41(b). As a result, the amounts of deficiency and additions to tax asserted for 1983 have been increased, and the amounts for 1984 and 1985 decreased, as follows: Additions to Tax Year
Deficiency
Sec. 6653(b)(1)
Sec. 6653(b)(2)
Sec. 6661
1983
$ 37,114
$ 18,557
[1]
$ 9,279
1984
21,599
10,800
[1]
5,286
1985
19,880
9,940
[1]
4,970
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule *64 references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded. After concessions by respondent, the issues for decision are: (1) Whether petitioner understated his income during each of the years in issue; (2) whether petitioner is liable for additions to tax for fraud pursuant to section 6653(b)(1) and (2); and (3) whether petitioner is liable for additions to tax for substantial understatement of income tax pursuant to section 6661. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner resided in Mesa, Arizona, at the time he filed his petition in this case. He graduated from State University of Iowa where his coursework included classes in sociology, criminology, and business administration. Although petitioner received no formal training as an accountant, he took a bookkeeping class in high school and received instruction from his accountant on how to prepare and maintain corporate books. Petitioner timely filed joint Federal income tax returns with his then wife, Rosemary Seidenfeld, [1] for each of the years *65 in issue. They resided in Des Moines, Iowa. Their tax returns were prepared by Willis Savage (Savage). In the notice of deficiency, respondent determined that petitioner diverted corporate income for his personal use (dividend income) for each of the years in issue without reporting this income on his individual tax returns as follows: Year
Amount
1983
$ 82,661
1984
47,127
1985
48,325
In addition, respondent determined from cash bank deposits that petitioner had unreported income derived from unidentified sources for each of the years in issue as follows: Year
Amount
1983
$ 6,612
1984
13,020
1985
12,981
At trial, respondent produced evidence that during the years in issue petitioner received dividend income and made cash deposits from unidentified sources as follows: Dividend
Cash Deposits from
Year
Income
Unidentified Sources
1983
$ 85,256
$ 6,000
1984
49,995
9,400
1985
47,665
8,700
*66 During the years in issue, petitioner and his brother, Dennis Seidenfeld (Dennis), each owned a 50-percent interest in, and operated, four corporations: Automotive Wholesale, Inc. (AW), Central Midwest Wreckers, Inc. (CMW), North Central States Conference Lines, Inc. (NCSCL), and Road Runner. AW, CMW, and NCSCL were Iowa corporations. The record is silent as to the state in which Road Runner was incorporated. AW was engaged in the business of selling new, used, and rebuilt automotive parts in the Des Moines area. Both CMW and NCSCL were engaged in the business of providing a telephone long-line communication service used to locate automobile parts for automotive parts stores and salvage yards in an 11-State area. Road Runner delivered the automotive parts to persons that used the services of CMW and NCSCL. Road Runner also delivered auto parts sold by AW. Petitioner was president and treasurer of AW and vice president of CMW and NCSCL. Dennis was president of CMW and NCSCL, and vice president of AW. Petitioner was considered the "inside man" and Dennis the "outside man" for the corporations. Savage was the accountant for AW, CMW, and NCSCL. Petitioner was responsible for *67 the recordkeeping of AW, CMW, and NCSCL. The record is silent as to petitioner's duties with respect to Road Runner. We will hereinafter discuss each corporation separately. AW
AW sold a wide range of automotive merchandise, including hubcaps, T-tops, starters, alternators, front ends, rear clips, and doors. AW sold to both retail and wholesale customers. Retail customers came in "off the street" to buy merchandise. They paid for merchandise at the time of purchase by cash, check, or credit card. Wholesale customers, such as body shops, automotive parts shops, and automotive dealers, paid for merchandise by cash, check, or credit card, or "on account". Dennis was vice president of AW. He was responsible for purchasing AW's merchandise. Petitioner was responsible for maintaining AW's monthly billing, recording its income and expenses, keeping the corporate checkbooks, maintaining accounts receivable, and preparing all tax and other required forms. However, he was not responsible for preparing the corporate tax returns. With respect to AW's cash, check, or credit card sales, petitioner would post the amount of the sales receipts to the Daily Sales and Cash Report *68 (Report). When a sale was made "on account", petitioner would draw up an invoice and attach it to a ledger card. When a payment was made on the account, petitioner would make a notation on the ledger card. Petitioner used the ledger cards to determine "cash received on account" and "charges". He recorded both of these items on the Report. Petitioner then prepared a bank deposit slip and deposited the money received into the bank. Petitioner did not report all sales made. He diverted some of the checks and cash received from AW's customers by depositing the checks into his or Dennis' personal accounts or negotiating the checks for cash. He concealed the transactions by either not preparing ledger cards or not recording receipt of the checks on the ledger cards. AW purchased some of its inventory with cash. At times, petitioner purchased merchandise for AW's inventory by cashing checks issued to AW, CMW, and NCSCL, and, at other times, he purchased merchandise using cash from the cash register. Inventory purchases made with cash (either from checks issued to AW, CMW, or NCSCL, or from the cash register) were supposed to be recorded on the Report as "Cash Paid Out-Mdse", and *69 were also supposed to be recorded on AW's general ledger. However, AW's general ledger does not include any inventory purchases made with funds petitioner obtained from cashing checks issued to AW, CMW, or NCSCL. Petitioner and Dennis were the subjects of a criminal tax investigation for the years 1983-86. During the criminal investigation, petitioner produced receipts substantiating some of the cash purchases of inventory. However, the receipts do not indicate the source of cash used to pay for the inventory. Savage prepared AW's corporate returns using the Reports petitioner supplied. Petitioner signed these returns. When petitioner received a check that he deposited into his personal bank account or negotiated for cash, he did not record the sales proceeds represented by the check on the Report. When sales proceeds were not recorded on the Report, Savage did not report them on AW's tax return. Petitioner also did not report the diverted amounts on his individual tax returns. AW never declared or paid any dividends. AW had earnings and profits in excess of the amounts diverted by petitioner and Dennis for each of the years in issue. CMW and NCSCL
Petitioner's *70 duties as recordkeeper for CMW and NCSCL were the same as those he performed for AW. CMW and NCSCL customers were required to pay in cash or by personal check. Customers would either mail in their subscription fees or personally deliver them to Dennis during his travels throughout the midwestern United States soliciting subscribers for CMW's and NCSCL's telephone line service. When petitioner or Dennis received checks from customers, they endorsed them and frequently deposited them into one of their personal bank accounts or negotiated them for cash. When CMW or NCSCL made a sale, petitioner usually recorded the sales proceeds on CMW's or NCSCL's income ledger. However, when petitioner or Dennis received a check that they deposited into one of their personal bank accounts or negotiated for cash, petitioner did not record the sales proceeds represented by the check on CMW's or NCSCL's income ledger. Savage prepared the corporate returns for CMW and NCSCL using the income ledgers petitioner provided. Petitioner signed the corporate returns. Because the diverted checks were not recorded in CMW's or NCSCL's income ledgers, Savage did not report these funds on CMW's or NCSCL's corporate *71 returns, and these amounts were not included in either corporation's income. Neither petitioner nor Dennis reported the diverted amounts on his individual tax returns. CMW and NCSCL never declared or paid any dividends. Both corporations had earnings and profits in excess of the amounts diverted by petitioner and Dennis. Road Runner
Dennis was primarily responsible for Road Runner's operations. He did not keep any books or records detailing the revenues and expenses Road Runner incurred during the years in issue. Customers paid for Road Runner's services in cash or by issuing checks payable to Dennis, AW, CMW, or Road Runner. On occasion, petitioner and Dennis endorsed and diverted customer checks from Road Runner into their respective personal bank accounts or negotiated the checks for cash. The record contains little other information with regard to this corporation. Neither petitioner nor Dennis reported on their respective Federal income tax returns any of the income from checks they diverted. Cash Deposits
During the years in issue, petitioner made deposits from unexplained sources of approximately $ 24,000 into his personal checking account. He did not *72 report any of these deposits as income on the joint income tax returns he filed with his wife for these years. Criminal Investigation of Petitioner
In March 1990, the U.S. Department of Justice charged petitioner and Dennis, in violation of 18 U.S.C. section 371, with conspiracy to commit offenses or to defraud the United States in diverting corporate receipts from AW, CMW, NCSCL, and Road Runner totaling approximately $ 282,000, and concealing the diversion of these receipts from the Internal Revenue Service for the period January 1, 1983, through March 6, 1986. On March 13, 1990, both petitioner and Dennis pled guilty to conspiring to commit offenses or to defraud the United States in violation of 18 U.S.C. section 371. At the time of the plea, an agreed statement of facts was filed, in which petitioner admitted, in pertinent part, the following: 7. On or about January 1, 1983, Edward Seidenfeld and Dennis Seidenfeld entered into an agreement with each other to defraud the United States by impairing, impeding and obstructing the Internal Revenue Service in the exercise of its lawful functions. *73 Specifically, Edward Seidenfeld agreed with Dennis Seidenfeld to divert corporate receipts which totalled approximately $ 282,000 from Central Midwest, North Central States, Automotive Wholesale and Road Runner, and to conceal the diversion of these receipts from the Internal Revenue Service. 8. The scheme to defraud operated as follows: (a) Checks issued by customers of either Central Midwest, North Central States, Automotive Wholesale or Road Runner, as payment for goods or services provided to these customers were taken by either Edward Seidenfeld or Dennis Seidenfeld and either deposited into a personal bank account or converted to cash. (b) The funds diverted in this manner were used by Edward Seidenfeld and Dennis Seidenfeld principally for personal expenses and otherwise commingled with other personal monies. (c) Neither Edward Seidenfeld nor Dennis Seidenfeld reported the diverted funds to their return preparer, causing these amounts to be omitted from each of their federal individual income tax returns (Forms 1040) for the years 1983, 1984 and 1985. (d) Edward Seidenfeld and Dennis Seidenfeld agreed not to record the diverted receipts on the income ledgers from Central *74 Midwest and North Central States for the calendar years 1983, 1984 and 1985. Accordingly, the diverted receipts were not so recorded. (e) Edward Seidenfeld and Dennis Seidenfeld agreed to and, in fact, did provide these income ledgers to the corporations' return preparer, knowing the income ledgers omitted substantial corporate receipts.
9. Edward Seidenfeld committed a fraud on the Internal Revenue Service in the following manners: (a) Edward Seidenfeld knowingly signed and caused to be filed false federal corporate income tax returns on behalf of Central Midwest for the years 1983, 1984 and 1985. These returns were false because they did not report the income diverted from Central Midwest by Edward Seidenfeld and Dennis Seidenfeld. (b) Edward Seidenfeld knowingly signed and caused to be filed false federal corporate income tax returns on behalf of North Central States for the years 1983, 1984 and 1985. These returns were false because they did not report the income diverted from North Central States by Dennis Seidenfeld and Edward Seidenfeld. (c) Edward Seidenfeld knowingly signed and caused to be filed false federal individual income tax returns for the years 1983, *75 1984 and 1985. These returns were false because Edward Seidenfeld did not report or cause to be reported approximately $ 179,000 which he diverted from Central Midwest, North Central States, Automotive Wholesale and Road Runner. (d) On numerous occasions Edward Seidenfeld individually endorsed customer checks issued to Central Midwest, North Central States, Automotive Wholesale, and Road Runner as payment for goods and/or services, and deposited these checks into his personal bank account or negotiated the checks for cash. (e) With respect to the preparation of the federal corporation income tax returns for Central Midwest and North Central States for 1983, 1984 and 1985, Edward Seidenfeld delivered false income ledgers for both of the corporations for each year to the corporations' tax return preparer.
Petitioner was sentenced to a year's imprisonment, but served only 91 days. ULTIMATE FINDINGS OF FACT 1. During the years 1983, 1984, and 1985, petitioner diverted to himself, and used for personal purposes, $ 85,256, $ 49,995, and $ 47,665, respectively, from the incomes of CMW, NCSCL, and AW. 2. The diverted income represents taxable income to petitioner for the years *76 1983, 1984, and 1985. 3. The diverted income was not reported on petitioner's joint Federal income tax returns for the years 1983, 1984, and 1985. 4. The cash deposits of $ 6,000, $ 9,400, and $ 8,700, that petitioner made into his personal checking account during the years 1983, 1984, and 1985, respectively, represent taxable income to him for the respective years. 5. The cash deposits were not reported on petitioner's joint Federal income tax returns for the years 1983, 1984, and 1985. 6. All of the understatements of tax required to be shown on petitioner's joint Federal income tax returns for the years 1983, 1984, and 1985 are due to fraud. OPINION Issue 1. Petitioner Failed To Report Dividend and Cash Deposit Income
The Commissioner has broad discretion to determine whether the taxpayer's accounting method clearly reflects income. Commissioner v. Hansen, 360 U.S. 446, 467 (1959). If the taxpayer's accounting method does not clearly reflect income, the Commissioner may recompute income using any method which she determines will clearly reflect income. Sec. 446; Meneguzzo v. Commissioner, 43 T.C. 824, 831 (1965). *77 The reasonableness of the reconstruction is considered in light of the surrounding facts and circumstances. Petzoldt v. Commissioner, 92 T.C. 661, 687 (1989). Once the Commissioner has linked the taxpayer to an income-producing activity, the burden of proving that the Commissioner's determination is erroneous, arbitrary, or otherwise invalid rests on the taxpayer. Resyn v. United States, 851 F.2d 660, 663 (3d Cir. 1988); Adamson v. Commissioner, 745 F.2d 541 (9th Cir. 1980), affg. T.C. Memo. 1982-371; Edwards v. Commissioner, 680 F.2d 1268 (9th Cir. 1982), affg. T.C. Memo. 1982-371. In the instant case, respondent contends that the joint returns petitioner filed for 1983, 1984, and 1985 did not accurately reflect petitioner's income for those years. Respondent used the specific item and bank deposits methods to redetermine petitioner's gross income. Each of these methods will be addressed in turn. Specific Item Method
The specific item method is "'direct in its operation. The usual strategy *78 . . . is for the Government to produce evidence of the receipt of specific items of reportable income by the * * * [taxpayer] that do not appear on his income tax return or appear in diminished amount'". United States v. Marabelles, 724 F.2d 1374, 1377 n.1 (9th Cir. 1984) (quoting United States v. Horton, 526 F.2d 884, 886 (5th Cir. 1976)). In the instant case, respondent determined the amount of income petitioner had received by obtaining canceled checks from third parties made payable to AW, CMW, NCSCL, and Road Runner. Respondent compared those amounts to the books and records of the corporations as well as to petitioner's personal bank records. Respondent thereafter determined that petitioner received $ 85,256, $ 49,995, and $ 47,665 of income in this manner for 1983, 1984, and 1985, respectively. Respondent demonstrated that petitioner diverted checks written to AW, CMW, NCSCL, and Road Runner into his personal account or negotiated the checks for cash. Petitioner was a major shareholder and an officer of all four corporations and maintained check-cashing authority with all of them. Respondent determined that *79 each corporation had sufficient earnings and profits to cover the amounts diverted by petitioner. Accordingly, respondent characterized the diverted funds as dividends. Secs. 301(c), 316. We find respondent's characterization of the diverted funds as dividends persuasive. Courts have consistently ruled that funds diverted by controlling stockholders should be characterized as dividends. United States v. Harvey, 996 F.2d 919, 920 (7th Cir. 1993); Rubber Associates v. Commissioner, 335 F.2d 75, 78 (6th Cir. 1964); Simon v. Commissioner, 248 F.2d 869, 873 (8th Cir. 1957), revg. and remanding U.S. Packing Co. v. Commissioner, T.C. Memo. 1955-194; United States v. Stonehill, 420 F. Supp. 46, 62 (C.D. Cal. 1976), affd. in part and revd. in part 702 F.2d 1288 (9th Cir. 1983). The dividend does not have to be formally declared to be treated as a dividend-in-fact. Noble v. Commissioner, 368 F.2d 439, 442 (9th Cir. 1966), affg. T.C. Memo. 1965-84. *80 Intent of the parties is not decisive. Id. at 443. As long as the evidence indicates that the distribution was made "under a claim of right or without any expectation of repayment", it may properly be characterized as a dividend. Id.
Respondent contends that petitioner used for personal purposes the checks tendered to the relevant corporations; he deposited the checks into his personal bank account or cashed them. Petitioner asserts that he cashed the checks from the various corporations and used the proceeds to buy merchandise for AW. [2]
*81 Petitioner's claim is contradictory to admissions he made during his criminal tax prosecution that he diverted corporate receipts from CMW, NCSCL, and AW during the years in issue for his own personal use. Further, the record does not show how much, if any, of the diverted funds were used to purchase inventory. Petitioner has failed to meet his burden of proof to overcome respondent's original determination. However, subsequent to the issuance of the notice of deficiency, respondent amended her original determination. Respondent thus has the burden of proof for new amounts asserted subsequent to the initial determination. Rule 142(a). Respondent has provided clear and convincing evidence as to the amended amounts through a thorough accounting and review of the relevant companies and petitioner's financial records. Respondent has therefore met her burden for the amended amounts. Because petitioner had the unfettered right to use all the diverted funds in any manner he desired, we sustain respondent's amended determinations made under the specific item method. Bank Deposits Method
"The bank deposits method assumes that all money deposited in a taxpayer's bank account *82 during a given period constitutes taxable income." DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), affd. 952 F.2d 16 (2d Cir. 1992); see also Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964). Bank deposits are prima facie evidence of income, and respondent does not need to show a likely source of the income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). For the years in issue, respondent determined income to petitioner of approximately $ 24,000 using the bank deposits method. Petitioner contends that the cash deposits came from gifts from his mother. He testified that his mother gave him money on birthdays and holidays. When confronted with the dates of the deposits, however, petitioner admitted that none of the dates had any significance. He subsequently testified that his mother liked to give him money for no special reason. We found petitioner to be less than fully candid and his testimony to be less than completely truthful. While we can accept petitioner's assertion that his mother gave him cash gifts on occasion, we do not accept his claim *83 that gifts from his mother constituted the source of the cash deposits. [3]
We considered each and every one of petitioner's claims and assertions. Some were intended to invoke the Court's sympathy but were not relevant. Others were relevant but were without support in the record. Petitioner did not introduce any evidence, other than his own testimony, to support his claims. We found parts of petitioner's testimony to lack credibility. Accordingly, we sustain respondent's determinations made under the bank deposits method. Issue 2. Petitioner Is Liable for Additions to Tax for Fraud Pursuant to Section *84 6653(b)(1) and (2)
Section 6653(b)(1) imposes an addition to tax equal to 50 percent of the underpayment if any part of the underpayment is due to fraud. Section 6653(b)(2) imposes an addition to tax of 50 percent of the interest payable under section 6601 with respect to that portion of the underpayment that is attributable to fraud. Although respondent prevailed on the deficiency issues, respondent cannot rely on petitioner's failure to carry his burden of proof in order to sustain respondent's burden of proving fraud. See Parks v. Commissioner, 94 T.C. 654, 660 (1990). Respondent has the burden of proving that some part of the underpayment was due to fraud, for purposes of section 6653(b)(1). Sec. 7454(a); Rule 142(b). For this purpose, respondent need not prove the precise amount of the underpayment resulting from fraud, but only that some part of the underpayment of tax for each year in issue is attributable to fraud. Lee v. United States, 466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274. *85 Fraud has been defined as "intentional wrongdoing on the part of a taxpayer motivated by a specific purpose to evade a tax known or believed to be owing". Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968). To prove fraud, the Commissioner must demonstrate by clear and convincing evidence that: (1) There was an underpayment of tax, and (2) some part of this underpayment was due to fraud. Sec. 7454(a); Rule 142(b); Plunkett v. Commissioner, supra.
Respondent may satisfy her burden on the first part of the fraud test, underpayment, by showing a likely source of the income. Parks v. Commissioner, supra at 661. As to the deficiencies previously discussed, respondent has demonstrated by clear and convincing evidence that AW, CMW, NCSCL, and Road Runner were likely sources of petitioner's income. Fraud is a question of fact to be determined from the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Direct evidence of fraud is rarely *86 available; therefore, fraud may be proved by circumstantial evidence and reasonable inferences drawn from the facts. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. The court in Bradford articulated numerous "badges of fraud" from which fraudulent intent can be inferred. They are: (1) Understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealing assets; and (6) failure to cooperate with tax authorities. Id. Other activities that indicate fraudulent intent are engaging in illegal activities and inconsistent testimony during trial. Id. at 308; Henry v. Commissioner, 362 F.2d 640, 643 (5th Cir. 1966), affg. T.C. Memo. 1964-170. Although no single factor is determinative, the combination of a number of factors may form persuasive evidence of fraud. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. T.C. Memo. 1982-603; Beaver v. Commissioner, 55 T.C. 85, 93 (1970). *87 Respondent demonstrated that petitioner substantially understated his income for each of the years in issue. Although petitioner reported only $ 30,000 in compensation income for each of the years in issue, respondent demonstrated that petitioner diverted over $ 180,000 from AW, CMW, NCSCL, and Road Runner over the 3-year period. Respondent demonstrated that petitioner kept inadequate records and concealed assets. Petitioner made a practice of cashing corporate checks and depositing them into his own bank account or negotiating them for cash. To conceal his actions, he failed to record in the corporate books the checks that he diverted. Because the receipts were not recorded in the books, Savage (the tax preparer) did not know that the corporations had received that income. As a result, those amounts were never included in the incomes of petitioner or any of the corporations. Petitioner knew these amounts were never reported because they were not included in his joint tax returns or the corporate tax returns, all of which he signed. His actions reflect an intent to conceal income with the consequence of avoiding the payment of tax on such income. There were inconsistencies *88 in petitioner's testimony regarding both the diversion of corporate income and the cash deposits. Petitioner claims that Savage told him that he could obtain cash to purchase inventory by cashing checks from CMW, NCSCL, or AW customers and using the proceeds to purchase inventory. However, Savage stated that while he might have told this to petitioner, he never told petitioner that petitioner could cash such checks or deposit them into petitioner's personal bank account without recording these checks as sales revenues on the corporate books. Further, during petitioner's criminal tax prosecution, petitioner admitted that the CMW and NCSCL income ledgers that petitioner delivered to Savage were false. Petitioner testified that his mother gave him money on birthdays and holidays. After questioning by respondent, petitioner stated that his mother gave him money whenever she felt like it. As stated, we did not find petitioner's testimony to be completely truthful. The inconsistencies in petitioner's statements lend further support to our conclusion that petitioner's activities were motivated by a fraudulent intent to avoid taxation. See Guinn v. Commissioner, T.C. Memo. 1983-401. *89 Finally, respondent demonstrated that petitioner had engaged in illegal activities. In March 1990, petitioner pled guilty to conspiracy to commit tax fraud for the period January 1, 1983, through March 6, 1986. Coupled with petitioner's understatement of income, concealment of assets, inadequate records, and implausible explanations, petitioner's guilty plea lends weight to the conclusion that petitioner's evasion of taxes was undertaken with fraudulent intent. Considering all the evidence, we conclude that respondent has shown by clear and convincing evidence that all of the underpayments for the years in issue were due to fraud. Consequently, we hold that petitioner is liable for the additions to tax pursuant to section 6653(b)(1) and (2). Issue 3. Petitioner Is Liable for Additions to Tax for Substantial Understatement Pursuant to Section 6661
Section 6661 imposes an addition to tax if the amount of the understatement of income tax for the taxable year exceeds the greater of 10 percent of the tax required to be shown or $ 5,000. The amount of the addition is equal to 25 percent of the amount of any underpayment attributable to the understatement. Respondent determined *90 that there was a substantial understatement for each of the years in issue. Petitioner bears the burden of refuting respondent's determination. See Welch v. Helvering, 290 U.S. 111 (1933). In the instant case, petitioner did not address this issue. We have held that taxpayers concede the section 6661 issue when they fail to address it. Rothstein v. Commissioner, 90 T.C. 488, 497 (1988). Therefore, we hold that petitioner is liable for the additions to tax pursuant to section 6661. To reflect the foregoing and concessions by respondent, Decision will be entered under Rule 155. Footnotes
1. 50 percent of the interest due on the deficiency.↩
1. 50 percent of the interest due on the deficiency.↩
1. Respondent determined Rosemary Seidenfeld to be an innocent spouse and thus entitled to relief under sec. 6013(e) from the deficiencies and additions to tax determined by respondent for the years in issue.↩
2. Petitioner claims that during the criminal tax investigation discussed previously, he gave the Internal Revenue Service documentation substantiating cash purchases of merchandise inventory for AW. At the trial of this case, Special Agent Howard Stoffa testified that he kept microfilm copies of all records received from petitioner or his counsel. Special Agent Stoffa further testified that he returned all documents substantiating cash purchases of merchandise inventory for AW to either petitioner or his attorney. The record in this case was held open for 30 days after the close of trial so that respondent could take all actions possible to locate the microfilm that contained copies of the original cash purchase receipts. Respondent informed the Court that while the microfilm could not be located, a document receipt relating to the return of the cash purchase receipts was found. A copy of the document receipt was attached to respondent's reply to petitioner's posttrial brief. The document receipt indicates that the cash purchase receipts were returned to petitioner's then attorney, William Smith, on Sept. 21, 1987.↩
3. Dennis Seidenfeld, petitioner's brother, also claims his mother gave him cash gifts during 1983-85, which Dennis claims constituted the source for a part of the bank deposits that respondent determined to be income to Dennis. However, as is the case with petitioner in the instant case, we did not believe Dennis in that case. See Seidenfeld v. Commissioner, T.C. Memo. 1995-61↩.